UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.

                                                   Case No. 17-cr-56-pp

ROBERT RUTLEY,

    Defendant.

**ORDER DENYING EMERGENCY MOTION—PETITION IN REQUEST OF COMPASSIONATE RELEASE AND/OR RELIEF (DKT. NO. 34)**

On October 4, 2017, after the defendant pled guilty to one count of knowingly distributing child pornography, the court sentenced him to serve seventy-eight months in custody with credit for time served. Dkt. Nos. 26, 27.

On June 15, 2020, the court received the defendant's motion for compassionate release. Dkt. No. 34. The defendant is incarcerated at FCI Elkton in Lisbon, Ohio. Id. at 3. He says that in a class action suit pending in the Sixth Circuit, the court deemed Elkton as having conditions that qualified as cruel and unusual punishment due to the COVID-19 virus. Id. The defendant says that he and his fellow inmates have been exposed to dangerous and unsafe conditions that jeopardize their health. Id. The defendant says that Elkton is on lock-down; inmates spend all their time in overcrowded housing units that do not allow social distancing. Id. at 10. He indicates that inmates are allowed outside their cells for meals, hygiene items and to visit commissary, which means they interact with each other and with inmates from other

1

housing units at these times. Id. The defendant says that while Elkton is conducting mass testing, the inmates don't get the results until weeks after the test; inmates who test positive are moved into a quarantine unit. Id. at 11. He indicates that inmates who test negative are moved into his housing unit. Id. He says his housing unit has around 163 inmates in three-man, eighty-square-foot cubicles, and that inmates cannot purchase personal protective equipment. Id. at 12. The defendant reports that when he drafted his motion, forty staff and 150 inmates had tested positive, and nine inmates had died. Id. He indicates that the warden stated in a memo that of those tested, 30% tested positive. Id. The defendant says that when he has asked staff about what measures are being taken, he has been told that staff are "making it up as [they] go." Id. at 13.

The defendant also explains that until the epidemic broke out, he was participating in the Residential Drug Abuse Program (a program which, if completed, can earn an inmate time off his sentence), but that the program was suspended due to the epidemic. Id. at 4. The defendant calculates that if he finished RDAP and got his full community confinement placement, he would be released in early 2021. Id. While the defendant was participating in programming prior to the COVID-19 outbreak (including the RDAP program), he says that has been suspended now, which has elevated his depression and anxiety. Id. at 13.

The defendant says that his mother is of advanced age and at higher risk of contracting the virus. Id. He says she has several health issues, including

2

coronary heart disease. Id. The defendant's mother lives alone, and he says he could help her if he lived with her. Id. at 5. The defendant says that he, himself, is a "chronic care" inmate with asthma. Id. He says he needs more attention and care even during normal times, more so during the pandemic. Id. He says that he is being moved to a new facility because of the number of infections at Elkton, and that the move could increase his exposure to the virus, thus doubling his chance of infection. Id. at 5-6. The defendant says he has had no incident reports and has no history of violence. Id. at 6.

The defendant says that on April 11, 2020, he asked the warden of his facility for compassionate release, and that that request was denied on June 2, 2020. Id. at 8. The defendant asks that the court either sentence him to time served, reduce his sentence to one that allows for immediate release and order him to self-quarantine or modify his sentence to one of home confinement. Id. at 16-17.

The defendant filed a cover letter with his motion. Dkt. No. 34-2. The letter says that the defendant started the forty-week RDAP program on March 23, 2020, and would have been eligible for the year off his sentence had he completed it. Id. at 1. He says he also was accepted into a vocational tech construction program at the prison. Id. He alleges that if Elkton had been responsible in its handling of the pandemic, the RDAP program would not have been paused, he could have completed it in December 2020 and could have been on track for release to a halfway house in January or February 2021. Id. at 4-5.

3

He describes how the virus began to appear at the prison, with more and more inmates falling ill and, due to lack of information about the virus, the prison staff chalking the illnesses up to seasonal issues. Id. at 1. As more inmates became sick and some got taken to the hospital, the defendant says that the staff took no steps or precautions to slow the spread. Id. at 1-2. The defendant says that staff downplayed the virus and denied that there were any COVID cases in the prison. Id. at 2. The defendant asserts that the staff always has been one step behind and remains that way, and that this is why Elkton has become a hotspot for the virus. Id. at 2. He indicates that the ACLU has filed a lawsuit against the prison on behalf of the inmates, and that the lawsuit "created a list of 837 at risk inmates." Id. He says that the judge has ordered these inmates released to home confinement, but that the prison has appealed the ruling to the Supreme Court. Id. at 3. The defendant says that each ruling, including the Supreme Court ruling, has found in favor of the inmates, and that Attorney General Barr has supported the inmates' release. Id. The defendant states, however, that Elkton has refused to comply with the court's orders and has stalled the release of the inmates on the list. Id. The defendant asserts that he is on that list because he suffers from asthma, which he developed after serving twenty-three years as a firefighter in Milwaukee. Id. The defendant also says he suffers from depression and anxiety and has bi-polar disorder. Id.

The defendant describes in more detail his mother's health condition, and explains that he lost his father in January 2018. Id. at 4. If released, he proposes to live with his mother at her house. Id.

The court asked Federal Defender Services to review the motion to determine whether it might file something on the defendant's behalf. Dkt. No. 35. Federal Defender Services responded that due to the demands on its time, it could not file anything for the defendant, but emphasized that it was not taking a position on whether the court should grant the defendant's motion. Dkt. No. 36.

The court also asked probation and the government to weigh in on the defendant's motion. As of July 2, 2020, probation reported that the BOP showed that Elkton had 240 inmates and seven staff who had tested positive for COVID-19, with nine inmate deaths and 582 inmates and forty-six staff having recovered. Dkt. No. 38. The BOP reported that it was reviewing cases for potential early release to home confinement, giving priority to inmates with COVID-specific risk factors. Id. at 1. The BOP records show that the defendant applied for compassionate release on April 5, 2020, and again on April 16, 2020; the warden denied his request on April 27, 2020. Id. at 2. BOP health records showed that the defendant had been followed on a regular basis in the clinic since arriving at Elkton and had remained medically stable; he was classified as Medical Care Level II. Id. He did not have a terminal disease or a life expectancy of eighteen months or less, was not disabled or unable to care for himself and did not qualify for release under the BOP's policy. Id. The BOP

5

reported that the defendant had twice been tested for the virus, with one test being inconclusive and the results of the second test unavailable at the time of probation's memo. Id. The records confirmed the defendant's mental health issues as well as his asthma (for which he has been prescribed an inhaler as needed). Id.

BOP records also confirmed that the defendant has taken programming—classes in AIDS awareness and history—and has been enrolled in a building trades program and in the RDAP. Id. The BOP shows his projected release date as September 1, 2022 and his full-term expiration date as August 18, 2023. Id. at 3.

The government concedes, as anyone must, that Elkton has been hit hard by the virus. Dkt. No. 43 at 1-2. It argues, however, that the defendant has not demonstrated extraordinary and compelling reasons for a sentence reduction, because he has not shown that his asthma is so severe as to create a high risk of severe illness if infected and because his family circumstances do not warrant release under the statute. Id. at 2. The government also argues that the defendant poses a danger to the community. Id. It asserts that the court does not have the authority to order the defendant released to home confinement. Id. at 1-2.

The law says that generally, a court may not modify a term of imprisonment once it has been imposed. 18 U.S.C. §3852(c). The compassionate release provision of the First Step Act makes an exception to that rule in certain narrow circumstances. It says:

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i) extraordinary and compelling reasons warrant such a reduction; or

(ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(b);

And that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; . . . .

The first part of that statute—section (c)(1)(A)—says that the Director of the Bureau of Prisons may make a motion to the court, asking for a compassionate release sentence reduction. The BOP has not done that here.

In the alternative, the statute says that the *defendant* may make a motion to the court after he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf." Probation confirms that the defendant did ask the warden for a compassionate release reduction and that the warden denied that request. It does not appear that the defendant appealed that denial through the BOP administrative remedies process as described in Program Statement 5050.50.

While the government questions whether the defendant has exhausted his administrative remedies, it asserts that rather analyze that issue, the court should deny the defendant's motion on the merits. The court, therefore, will move on to the merits of the motion.

Section 3852(c)(1)(A)(ii) doesn't apply to the defendant; he is not at least seventy years old (he is forty-seven), has not served at least ten years of his sentence and the BOP has not determined that he is not a danger to the community. So the only basis for the court to grant the defendant's motion would be §3582(c)(1)(A)(i)—if there were "extraordinary and compelling reasons" that warranted a sentence reduction. The application note to U.S.S.G. §1B1.13 defines "extraordinary and compelling" reasons:

> (A) **Medical Condition of the Defendant.**—
>
> (i) The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (*i.e.*, a probability of death within a specific time period) is not required. Examples included metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.
>
> (ii) The defendant is—
>
> (I) suffering from a serious physical or medical condition,
> (II) suffering from a serious functional or cognitive impairment, or
> (III) experiencing deteriorating physical or mental health because of the aging process,
>
> That substantially diminishes the ability of the defendant to provide selfcare within the environment of a correctional facility and from which he or she is not expected to recover.

(B) **Age of the Defendant.**—The defendant (i) is at least 65 years old; (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and (iii) has served at least 10 years or 75% of his or her term of imprisonment, whichever is less.

(C) **Family Circumstances.**—

(i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

(ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) **Other Reasons.**—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

The defendant does not fall into categories (A) or (B). He has explained in detail his mother's serious health issues, and he says that while his brothers try to help, they have their own lives, families and careers. Dkt. No. 34-2 at 4. The defendant says that if released, he could live with his mother and help her. The court doesn't doubt the defendant's concern for his mother and his desire to help her. But the statute allows a reduced sentence only if the caregiver of the defendant's minor children dies or is incapacitated or if the defendant's spouse or partner is incapacitated and the defendant is the only available caregiver. Despite the defendant's mother's health and his concerns, category (C) does not apply to him.

So the court must analyze whether there are some other extraordinary or compelling circumstances in this defendant's particular case that warrant the compassionate release reduction.

The defendant suffers from asthma. In a bond study prepared in March 2017 in connection with the defendant's detention hearing, the defendant "denied any history of significant physical health problems or current health concerns." Dkt. No. 10 at 3. In the September 2017 presentence report, the defendant stated that his health was "generally good," but reported that he "does suffer from asthma and uses an inhaler as needed." Dkt. No. 24 at ¶85. As discussed above, the BOP reports that the defendant has asthma and is prescribed an inhaler, but that he is medically stable. Dkt. No. 38 at 2.

The Centers for Disease Control and Prevention indicate that "[p]eople with moderate to severe asthma *might* be at higher risk of getting very sick from COVID-19." https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html. The American Academy of Allergy, Asthma and Immunology indicates that "currently there is no evidence of increased infection rates in those with asthma," and that "there are no published data" to support the CDC's determination that people with moderate to severe asthma could be at greater risk for more severe disease. https://www.aaaai.org/conditions-and-treatments/library/asthma-library/covid-asthma. The government cites the American Academy of Family Physicians asthma classification hierarchy, which describes someone with "persistent moderate" asthma as having daily symptoms and some limitations on daily activity, and describes someone with "persistent severe" asthma has

10

Case 2:17-cr-00056-PP   Filed 07/17/20   Page 10 of 18   Document 46

having symptoms throughout the day, being awakened as many as seven nights a week and having extreme limitations on daily activity. Dkt. No. 43 at 13, citing https://www.aafp.org/afp/2009/0501/p761.html#:~:text=CLASSIFICATION.

The defendant has not described either moderate or severe asthma, as defined by the AAFP. He simply asserts that he has asthma. With little to no medical evidence that the simple fact of having asthma makes a person more vulnerable to infection or more vulnerable to severe illness if infected, the fact that the defendant has asthma is not an extraordinary and compelling reason for release.

This is true even in the environment at Elkton, which admittedly is severe in terms of the number of inmates infected. The defendant has mentioned the lawsuit against Elkton.[1] Craig Wilson, *et al.* v. Mark Williams, *et al.,* Case No. 20-cv-794-JG, is currently pending before United States District Judge James S. Gwin in the Northern District of Ohio. This is a putative class action *habeas* petition under 28 U.S.C. §2241 filed by inmates at FCI Elkton regarding the COVID-19 crisis at that institution; the petition alleges that FCI Elkton has exhibited deliberate indifference to the serious medical needs of inmates in violation of the Eighth Amendment. On April 22, 2020, Judge Gwin issued a preliminary injunction; among other things, the order required the

---

[1] The court's July 8, 2020 order granting the government an extension of time to respond to the defendant's motion specifically asked the government to address this lawsuit in any response it filed. Dkt. No. 42. The government did not do so.

11

respondents to "identify, within one (1) day all members of the subclass as defined in this Order." Id. at Dkt. No. 22, page 20. Judge Gwin defined the subclass as those identified by the CDC as being at higher risk . . . [including] all Elkton inmates 65 years or older and those with documented, pre-existing medical conditions, including heart, lung, kidney, and liver conditions, diabetes, conditions causing a person to be immunocompromised (including, but not limited to cancer treatment, transplants, HIV or AIDS, or the use of immune weakening medications), and severe obesity (body mass index of 40 or higher). Id. at 12. Judge Gwin excluded from the subclass anyone whose only risk factor was a history of smoking. Id. Judge Gwin ordered that once the respondents had identified the members of the subclass, they should "evaluate each subclass member's eligibility for transfer out of Elkton through any means, including but not limited to compassionate release, parole or community supervision, transfer furlough, or non-transfer furlough within two (2) weeks," and he required the respondents to "prioritize the review by medical threat level." Id. at 20. As an example, he mentioned older inmates with heart, pulmonary, diabetes or immunity risks being prioritized over subclass members who were younger. Id. He ordered that any subclass members who were not eligible for any of the above "must be transferred to another BOP facility where appropriate measures, such as testing and single-cell placement, or social distancing, may be accomplished." Id. at 21. He required the BOP to quarantine anyone so transferred for fourteen days prior to transfer out of Elkton. Id.

On April 27, 2020, the BOP noticed their interlocutory appeal from Judge Gwin's order granting injunctive relief. Id. at Dkt. No. 26. On April 28, 2020, it filed an emergency motion asking the Sixth Circuit Court of Appeals to stay Judge Gwin's order pending the resolution of that appeal, id. at dkt. nos. 29, 30, but on April 30, 2020, the appellate court denied that request, id. at dkt. no. 38. The BOP then sought an administrative stay of disclosure of the inmate list. The Sixth Circuit denied that motion April 30, 2020. Id. at Dkt. No. 38. That same day—April 30, 2020—the respondents filed the list identifying subclass members. Id. at Dkt. No. 35-1. The defendant's name appears on the fourth page of the list. Id. at 4.

There followed extensive litigation to enforce Judge Gwin's order, including the BOP filing an application with the United States Supreme Court, asking that court to stay the order. While that motion was pending, however, Judge Gwin issued an order requiring the BOP to follow the order for injunctive relief. Id. at Dkt. No. 85. Because the BOP had not appealed *that* order, the Court declined the request to stay. https://www.supremecourt.gov/orders/courtorders/052620zr_e2p3.pdf. The BOP then appealed to the Sixth Circuit Judge Gwin's order requiring the BOP to comply with his order, id. at dkt. no. 95, and filed an emergency motion to stay, id. at dkt. no. 98. The Sixth Circuit denied that motion on June 1, 2020. Id. at Dkt. No. 107.

The BOP returned to the Supreme Court, and this time, it granted the stay until the Sixth Circuit could decide the BOP's appeal of the order requiring the BOP to transfer or release inmates. Id. at Dkt. No. 111, 111-1. Five days

13

later, on June 9, 2020, the Sixth Circuit vacated the order of preliminary injunctive relief. Id. at Dkt. No. 117. All three judges on the panel agreed that with regard to the likelihood of success on the merits prong of the injunctive relief standard, the petitioners had demonstrated the first, objective prong of the deliberate indifference test—that they were incarcerated under conditions posing a substantial risk of serious harm. Id. at 13. Two of the three judges, however, concluded that the petitioners had not demonstrated that they could succeed on the subjective prong of the deliberate indifference test—whether the BOP acted with deliberate indifference. Id. at 13-20. Chief Judge Guy Cole disagreed. Id. at 21-26. As far as this court can tell, the Sixth Circuit has not yet issued the mandate. Id. at Dkt. No. 148. Presently, the parties are litigating class certification, and the respondent is filing daily status reports showing the number of tests performed each day and the number of those tests that are positive. On July 16, 2020, for example, Elkton administered twenty-seven Abbott Rapid Tests, with one positive result, and took 132 Quest Diagnostics swabs with eighteen positive results. Id. at Dkt. No. 154.

      The upshot of all this is that, although the defendant is correct that Judge Gwin and the judges of the Sixth Circuit found that the inmates at Elkton are incarcerated under conditions that pose a substantial risk of serious harm, the Sixth Circuit concluded that the inmates were unlikely to be able to show that the BOP had been deliberately indifferent to that risk, and it struck down Judge Gwin's order requiring the BOP to transfer or release inmates. Contrary to the defendant's assertions, the Supreme Court did not agree with

the inmates—at least, it hasn't as of this point in the litigation. Right now, there is no order requiring the BOP to move inmates out of Elkton. Even Judge Gwin's now-stricken order indicated that the BOP should grant compassionate release, community supervision, parole, furlough or non-transfer furlough to those inmates with more severe COVID vulnerabilities, and ordered transfer to another facility—not release—for those with less severe vulnerability. The defendant is not sixty-five or older. There is no evidence that he has chronic kidney disease, COPD, a compromised immune system from an organ transplant, a body-mass index of 30 or higher, a serious heart condition, sickle cell or Type 2 diabetes. https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html.

The existence of the virus in a prison—even the level of infection at Elkton—is not sufficient to establish extraordinary and compelling circumstances without some proof that the defendant is at more severe risk for infection or severe illness than his fellow inmates. The fact that the defendant has asthma controlled by use of an inhaler when needed does not appear to pose that more severe risk.

The defendant has talked about his frustration with the fact that his efforts to better himself and get out sooner—through the RDAP and other programs—have been thwarted by the virus. He indicates that this contributes to his depression and anxiety. If the court were in the defendant's shoes, it

would be frustrated, too. But that frustration is not sufficient to constitute extraordinary and compelling circumstances under the statute.

Even if the defendant could show that his health condition and the conditions at FCI Elkton constituted extraordinary and compelling reasons for the court to drastically reduce his sentence, the court still would have to consider the factors under 18 U.S.C. §3553(a)—the nature and circumstances of the offense and the history and characteristics of the defendant; the need for punishment, deterrence and protection of the public; and the need to avoid unwarranted sentencing disparities. For some six months (that the government knew of), the defendant distributed thousands of images and videos containing child pornography while he was on duty with the fire department. Some of the images were masochistic. After he was interviewed by law enforcement, the defendant fled to Montana, where he was arrested, requiring the expense of additional time and resources by law enforcement. Despite the serious nature of these offenses (there was a mandatory minimum sentence of sixty months), the court imposed a sentence a year and a half less than what the government requested and almost seven years less than the low end of the guideline range. The defendant has served two years and seven months of his six-and-a-half-year sentence.

The court believes that the sentencing guidelines often are inordinately high for those convicted of child pornography offenses; that is why it imposed a below-guidelines sentence and one below the sentence the government recommended. But these crimes are not victimless, and they cause lingering

16

damage to the victims for years—often the rest of their lives. The court also notes that it has imposed similar, sometimes greater, sentences on others convicted of child pornography offenses, and one of the factors the court must consider under §3553(a) is avoiding unwarranted sentencing disparities among similarly-situated defendants.

The government argues that the defendant is a danger to the community. The defendant insists that he is not—as he did at sentencing, he argues in his motion that he plans to live a law-abiding life when he is released. The court takes the defendant at his word. But given the serious offenses and the defendant's subsequent flight, the court cannot conclude that the §3553(a) factors weigh in favor of release.

The court does not mean to trivialize the defendant's concerns about COVID-19. The court has heard from many, many inmates in the last three months, terrified of contracting the virus. It has heard from inmates worried about their families and friends. It has heard from inmates who say they cannot practice social distancing, do not have masks, cannot wash their hands frequently, have no access to hand sanitizer. It is much harder for inmates to take the precautions that public health experts advise all of us to take to avoid the spread of this dangerous virus. The court understands why the defendant filed his motion.

If, however, fear of the virus were a basis for granting a sentence reduction for compassionate release, there would no longer be inmates in any jails or prisons. The defendant has not demonstrated the extraordinary and

17

compelling circumstances that would justify the sentence reduction he requests.

As to one form of specific relief the defendant requested—that the court order modify his sentence to supervised release or home confinement—the government is correct that the court does not have the authority to order the BOP to place the defendant on home confinement. Section 3624(c) of Title 18 gives the Bureau of Prisons, not the court, the authority to place an inmate on home confinement.

The court **DENIES** the defendant's emergency motion—petition in request of compassionate release and/or relief. Dkt. No. 34.

Dated in Milwaukee, Wisconsin this 17th day of July, 2020.

**BY THE COURT:**

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**